# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

NICHOLAS D. GROOS

(Name and Address of Defendant)

KC **FILED**
JUN 07 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CRIMINAL COMPLAINT

CASE NUMBER: **06CR 0420**

**MAGISTRATE JUDGE MASON**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On or about January 4, 2002 in Cook county, in the Northern District of Illinois defendant(s) did, (Track Statutory Language of Offense)

willfully violate the orders and regulations of the Iranian Embargo prohibiting the exportation and transshipment of United States goods to Iran by exporting fire protection equipment (sprinkler systems) valued at approximately $8,957.51, when he was aware that the goods ultimately were destined for Melli Etfae Iran Company, located in Iran, without the required export authorization;

In violation of Title 50, United States Code, Sections 1702 and 1705(b); Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 500.701 (a)(2); and Title 18, United States Code, Section 2.

I further state that I am a Special Agent, Bureau of Immigration and Customs Enforcement, and that this complaint is based on the following facts:

See attached affidavit

Continued on the attached sheet and made a part hereof: _x_ Yes __ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

June 7, 2006                at      Chicago, Illinois
Date                                City and State

MICHAEL T. MASON, U.S. Magistrate Judge
Name & Title of Judicial Officer              Signature of Judicial Officer

County of Cook        )
                      )  SS
State of Illinois     )

## AFFIDAVIT

I, Javier Duran, being first duly sworn, state as follows:

1. I am a Special Agent of the United States Bureau of Immigration and Customs Enforcement, and I have been so employed for approximately four years.

2. I submit this affidavit in support of a criminal complaint against Nicholas D. Groos.

3. As set forth in detail below, there is probable cause to believe that on or about January 4, 2002, Groos willfully violated the orders and regulations of the Iranian Embargo prohibiting the exportation and transshipment of United States goods to Iran by causing the export of fire protection equipment (sprinkler systems) valued at approximately $8,957.51, when he was aware that the goods ultimately were destined for Melli Etfae Iran Company, located in Iran, without the required export authorization, in violation of Title 50, United States Code, Sections 1702 and 1705(b); Title 31, Code of Federal Regulations, Sections 560.303, 560.204, and 500.701 (a)(2); and Title 18, United States Code, Section 2.

4. At all times material to this affidavit:

   a. Viking Corporation (hereinafter "Viking US") was a United States company located in Hastings, Michigan.

   b. Viking US manufactured and sold, among other products, fire protection equipment, including sprinkler systems, valves, and related devices.

c.  The chief operating officer of Viking US will be referred to as "the COO" hereinafter.

d.  Viking SA was a wholly-owned subsidiary of Viking Corporation located in Luxembourg, which sold Viking US products to customers in Europe, Asia, and the Middle East.

e.  Viking US and Viking SA did not have authorization from the U.S. Government to export fire protection equipment from the United States to Iran.

f.  Nicholas D. Groos was a citizen of the United States and was the president of international operations of Viking SA.

g.  A financial officer at Viking SA will be referred to as "the FO" hereinafter.

h.  The director of operations of Viking SA will be referred to as "the DO" hereinafter.

i.  Melli Etfae Iran Company, a customer of Viking SA since no later than approximately 1996, was an Iranian company located in Tehran, Iran.

j.  Dafoos Fire Protection Equipment and Trading Company, an agent of Viking SA since no later than approximately September, 2001, was located in Dubai, United Arab Emirates.

## International Emergency Economic Powers Act (IEEPA)

5.  The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat. 50 U.S.C. §1702 authorized the President of the United States to investigate, among other things, any transfer, transportation, importation or exportation of any property subject to the jurisdiction of the United States during the circumstances provided for in 50 U.S.C. §1701. 50 U.S.C. § 1705(b) provided that whoever willfully violated, or willfully attempted to violate, any license, order or regulation issued under the International Emergency Economic Powers Act shall be imprisoned for not more than ten years and fined not more than $50,000.

6.  On March 15, 1995, the President issued Executive Order No. 12957 finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959, effective May 6, 1995 and 13059, effective August 19, 1997, and Presidential Notice of March 10, 2004, was in effect at all times relevant to this complaint. The Presidential Notice of March 10, 2004,

additionally noted that the threat posed by Iran to the United States national security, foreign policy, and economy included Iran's "support for international terrorism."

7. Executive Orders No. 12959 and 13059 (the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited any dealing by a United States person, wherever located, including facilitating goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

## The Iranian Transactions Regulations

8. The Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

9. Under the Iranian Transactions Regulations, 31 C.F.R. Part 560:

  a. Section 560.204 provided that no goods, technology, or services may be exported, reexported, sold, or supplied to Iran, directly or indirectly from the United States or by a United States person, wherever located, without authorization. 31 C.F.R. § 560.204.

b.    Section 560.203 prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560. Section 560.203 further prohibited any attempt to violate the prohibitions contained in Part 560. 31 C.F.R. § 560.203.

10.    The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") had responsibility for administering the Iranian Transactions Regulations, and was the entity empowered to authorize transactions with Iran during the embargo. Such authorization, if granted, would be in the form of a license.

### The Export Administration Regulations (EAR)

11.    The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2401-2420, authorized the United States Secretary of Commerce to prohibit or curtail the export of any goods, technology, or software items, as necessary to protect the national security, foreign policy, nonproliferation, and short-supply interests of the United States. The Secretary of Commerce implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774. Although the EAA had expired, the EAR continued to be in effect under the provisions of IEEPA by virtue of Presidential Executive Order 13222 (August 17, 2001), as extended by Presidential Notice of August 7, 2003 (68 Fed. Reg. 47833).

12. The EAR identified items over which the United States Department of Commerce, through its Bureau of Industry and Security ("BIS") exercised regulatory jurisdiction. Items "subject to the EAR" included "all items in the United States" and "all U.S. origin items wherever located." 15 C.F.R. § 734.3. The EAR specifically provided that: "No person may export or reexport items subject to both the EAR and OFAC's Iranian Transactions Regulations without prior OFAC authorization." 15 C.F.R. § 746.7.

13. The Bureau of the Census and the Department of Commerce are authorized to collect information from all persons exporting cargo in foreign commerce or trade. (12 U.S.C. § 301). Pursuant to Foreign Trade Statistic Regulations, 15 C.F.R. Part 30, the exporter of cargo is required to file a Shippers Export Declaration ("SED") when the cargo is destined for a foreign port. The form must be completed by the principal party in interest or its agents in accordance with forms and regulations promulgated by the government. Through the SED the government collects required information about exports, including the foreign point of unloading, the country of destination, and the selling price of goods being exported for sale.

### The Conduct of Nicholas D. Groos

14. No later than on or about December 11, 2001, Nicholas D. Groos, as well as other employees and corporate officers of Viking SA, learned that Viking SA could not ship products to Iran without the authorization of the U.S. government. On that date, Groos sent an email to the FO of Viking SA, noting in the subject line "Iran Business" and stating, in

part, "you'll be getting a message from [the COO of Viking US]. I had no idea there were actually penalties involved and that we would have to pay them if caught. I don't agree with it politically, but I don't want to get anyone in trouble."

15. On December 12, 2001, the COO of Viking US sent an email to the FO of Viking SA, stating, in part, "in your absence, I told Nick [Groos] we CANNOT ship to Iran without a license which takes 7 weeks to apply for. He asked if we could ship it through France which I am checking on. Thanks for catching this before we shipped the order." Later that day, the COO of Viking US sent a subsequent email to the FO of Viking SA, noting in the subject line "Iran," and stating, in part, "you are a U.S. company and are prohibited from shipping to Iran, even if through a French company. If you know it's going to Iran and do it anyway, you break U.S. law and get fined and are subject to criminal penalties. In fact, a recent case involving Kidde was adjudicated and they were fined. DON'T DO IT WITHOUT A LICENSE."

16. The following day, December 13, 2001, a Viking SA customer service representative sent an email to Groos, copying, among others, Viking SA's DO and FO, stating "Gentlemen, as per attached e-mails, it seems (in fact it is obvious) that I should not ship any material to Iran. Today, I have 2 orders from Melli Etfae on my desk for $343424,81. Shall I proceed or not? If a licence is required, I will need to investigate where to get it from." Groos replied to the customer service representative, stating "very good questions indeed. You will have an answer tomorrow."

7

17. On the following day, December 14, 2001, an associate of the COO at Viking US sent an email to Viking SA's DO, FO, and Groos, which stated, in part, "FYI. Attached is one interesting case involving Kidde violating embargo rules to Iran." The attachment was a U.S. Department of Commerce press release regarding a civil penalty paid by Kidde-Fenwal, a Massachusetts company selling fire alarm control equipment, for violating the Iranian embargo in 1995, by falsely representing in shipping documents the ultimate destination of the equipment as its own affiliate in the UAE when it knew the equipment were destined for Iran.

18. On or about December 15, 2001, despite the warning from the COO of Viking US not to ship product to Iran, Groos, through Viking SA, arranged for certain shipments, as described below, to be sent to Melli Etfae Iran Company, located in Tehran, Iran, and routed through an agent of Viking SA, Dafoos Fire Protection Trading, Attn: Mr. Pillai, P.O. Box 50891, Dubai, UAE. On December 15, 2001, Hamid Ghandehari, an engineer associated with Melli Etfae, sent an email to Groos stating, in part, "[the DO] told me that he already spoken with your agent in Dubai and our deliveries are going to take place via them."

19. On December 17, 2001, the customer service representative sent Groos and the DO an email noting "Melli Etfae" in the subject line and stating, "for the 4 orders of Melli Etfae, Dafoos will get $2996.96. However, they will have to pay the airfreight from Dubai to Tehran (what is invoiced to Etfae should cover the shipment to Dubai + to Tehran.

8

The first two orders are ready in Luxembourg, and paid by Etfae. Attached is the detail of the orders + margin for Dafoos." The attachment consists of 4 orders, numbered 1 through 4, each reflecting the "total sell to Dafoos $" as follows: Order Number 1, $1280.13; Order Number 2, $6594.18; Order Number 3, $29,039.08, and Order Number 4, $3239.32."

20.   On December 18, 2001, Groos sent a facsimile to "Mr. Pillai" of Dafoos, stating "Please sign and return by fax the attach Amendment to our Distribution agreement signed November 15, 2001. Originals will be sent by express. Please sign one (1) and return. Please issue a purchase order for all 4 of the orders shown on the attached pages. Orders 1 and 2 will be dispatched today." Included with the fax was an amendment to a preexisting distributorship agreement between Viking SA and Dafoos, as well as the same four orders provided to Groos by the customer service representative in the email of December 17, 2001.

21.   On the same date, Mr. Pillai sent Groos a facsimile, including the signed amendment to the distribution agreement and stating, "With reference to your letter (ref #5456/V) dated 18th Dec. 2001 we would like to confirm our order as follows: Order Number 1, Amount $1280.13, Order Number 2, Amount $6594.18, Order Number 3, Amount $29,039.08, Order Number 4, Amount $3239.32." These orders and prices are the same as set forth in the orders attached to the customer service representative's email of December 17, 2001 and the Groos facsimile of December 18, 2001.

9

22. On December 18, 2001, the customer service representative for Viking SA instructed the customer service representative of Viking US to "pack whatever she has of order no. 96947OD because she is going to organize the shipment in 2 days," and noted that she is also faxing order numbers 96947OD as well as a copy of "Kennedy 96948 and Potter 96949." The products listed in 96947OD correspond with five of the items in order 3, and three of the items on order 4, of the orders attached to the customer service representative's email of December 17, 2001 and the Groos facsimile of December 18, 2001. The Viking SA customer service representative provided to Viking US a purchase order, falsely indicating that these goods were destined for Dafoos Fire Protection Trading Co., P. O. Box 50891, Mr. P.C.S. Pillai, Dubai, United Arab Emirates.

23. On December 18, 2001, the customer service representative of Viking SA sent an email to Mr. Pillai of Dafoos, informing him that "Viking has shipped Etfae's orders NISF 110/2001 and 115/2001 by airfreight to Dafoos, the above mentioned orders will be arriving in Dubai by December 22." The orders referenced by the Viking SA customer service representative were the first two of the same four orders referenced in her December 17, 2001 email to Groos and Groos' December 18, 2001 facsimile to Dafoos.

24. On December 31, 2001, the Viking SA customer service representative sent an email to Viking US, instructing their customer service representative to release partial order number 96974 OD to ABX Logistics, Elk Grove Village, Illinois.

25. On or about January 2, 2002, Viking US consigned the order to ABX Logistics and repeated to ABX the Viking SA customer service representative's false representation that the goods were destined for Dafoos Fire Protection Trading Co., P. O. Box 50891, Mr. P.C.S. Pillai, Dubai, United Arab Emirates.

26. On or about January 4, 2002, based on the information provided to them by Viking US, ABX Logistics prepared a Shipper's Export Declaration (SED), dated January 4, 2002, which listed Viking as the U.S. principal party of interest, Dafoos Fire Protection Trading as the ultimate consignee, the United Arab Emirates and the country of ultimate destination and referenced "Sprinkler systems in the amount of $8958." The first shipment of the goods were thereafter shipped to Dafoos in Dubai.

27. Dafoos paid for the goods in orders 1 through 4 on January 24, 2002. On that date, 2002, the Viking SA customer service representative received an email from Dafoos entitled, "reimbursement of payment from Iran," reflecting Orders 1 through 4 and showing amounts corresponding with the amounts shown in the Orders 1 through 4 that accompanied Groos' December 18 2002 facsimile and the customer service representative's December 17, 2001 email.

28. Based on the foregoing, there is probable cause to believe that Groos has violated Title 50, United States Code, Sections 1702 and 1705(b); Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 500.701 (a)(2); and Title 18, United States Code, Section 2.

FURTHER AFFIANT SAYETH NOT.

JAVIER DURAN, Special Agent
United States Bureau of
Immigration and Customs Enforcement

Sworn to and subscribed before
me this 7th day of June, 2006.

MICHAEL T. MASON
United States Magistrate Judge