**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )     Case No. 06 CR 420 |
| v. | ) |
| | )     Judge Joan B. Gottschall |
| NICHOLAS D. GROOS | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Before the court are four pretrial motions filed by defendant, Nicholas D. Groos

("Groos"): (1) a motion to dismiss insufficient indictment; (2) a motion to dismiss counts 2 and 4

for failure to state an offense; (3) a motion to strike surplusage; and (4) a motion for depositions

of foreign witnesses.[1]  For the reasons stated below, the court grants the motion to strike

surplusage [57], denies the motion to dismiss insufficient indictment [55] and the motion to

dismiss counts 2 and 4 [53], and denies without prejudice the motion for depositions of foreign

witnesses [58].

### I. BACKGROUND[2]

Groos was the president of Luxembourg-based Viking S.A. Viking S.A. is the

international division of The Viking Corporation, a United States company based in Hastings,

---

[1]On April 17, 2008, the court granted the Government's motion to strike certain language
from page three of its consolidated response to Groos's motions.  Consequently, the court has not
considered that language for purposes of this order.

[2]The first paragraph of this section consists of statements taken from Defendant's Motion
for Depositions of Foreign Witnesses.  The second paragraph consists of allegations taken from
the Government's Consolidated Response to Defendant's Pretrial Motions and from the
indictment.

Michigan that distributes fire suppression equipment ("Viking U.S."). In December 2001, Viking S.A. had Viking U.S. ship two partial orders from its Michigan warehouse to the United Arab Emirates ("UAE").

One order successfully arrived in Dubai, UAE. The other was intercepted by the U.S. Department of Commerce after notification by an Illinois-based freight forwarding company that had been alerted to the alleged final destination of the shipment: Iran. Neither Viking U.S. or Viking S.A. had the required authorization from the U.S. government to export goods from the United States to Iran. The Government indicted Groos on four counts in regard to these alleged transactions under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA"), the Iranian Transactions Regulations, 31 C.F.R. § 560 ("ITR"), and the Export Administration Regulations, 31 C.F.R. § 730-74 ("EAR"), which were promulgated pursuant to the Export Administration Act, 50 U.S.C. app. §§ 2401-20 ("EAA").

## II. ANALYSIS

### A. Motion to Dismiss Insufficient Indictment [55]

Groos argues that the indictment is legally insufficient because: (1) it understates and misrepresents the mental state required for conviction because it alleges that Groos acted willfully but does not allege that Groos knew his alleged conduct was illegal; and (2) it fails to inform Groos of the date of the alleged illegal conduct. He therefore asks the court to dismiss the indictment pursuant to Rule 12(b)(2), which provides that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the general issue." *See* Fed. R. Crim. P. 12(b)(2).

2

1.    Must the Indictment Include the Term "Knowingly"?

The relevant section of the IEEPA, upon which all four counts of the indictment rely, provides that:

> Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than twenty years, or both.

50 U.S.C. § 1705(b). The parties agree that, at trial, "[t]he government [i]s required to establish that [the defendant] *willfully* attempted to export goods to another country, *knowing* the ultimate destination was an embargoed country, without a license." *U.S. v. Reyes*, 270 F.3d 1158, 1170 (7th Cir. 2001) (citing 50 U.S.C. § 1705(b), 31 C.F.R. § 560.203-04, 15 C.F.R. § 785.4(b)(2), and 15 C.F.R. § 787.5(b)) (emphasis added). *Accord U.S. v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004) (holding that "the district court properly instructed the jury that it could not convict [the defendant] of violating the [Iranian] Embargo unless the defendant knew that [his conduct] was a violation of the embargo, and was, thus, illegal" (internal quotation marks omitted)). Groos acknowledges that each count of the indictment includes the term "willfully," but the parties dispute whether the term "knowingly" must be included in the indictment also.

Groos argues that it is not enough to track the language of the statute in this case because the term "willfully" is ambiguous and the indictment subsequently fails to apprise Groos of all the elements of the crime. He relies heavily on *Russell v. U.S.*, 369 U.S. 749 (1962), which holds that an indictment that fails to "apprise the defendant with reasonable certainty, of the nature of the accusation against him" is deficient, even if it tracks the language of the statute. *Id.* at 765. The Government points to *U.S. v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005), which rejected a

3

similar challenge to a similar indictment. In *Quinn*, the court acknowledged that the government had to prove that the defendant knew his conduct was illegal, but that in an indictment brought under 50 U.S.C. § 1705(b) alleging "willful" conduct sufficiently apprised the defendant of the charges he faced. *Id.* at 102. Groos contends that such a conclusion runs afoul of *Russell* because of the uncertainty about the meaning of "willfulness."

The court does not find the omission of the term "knowingly" to be fatal to the indictment. Although Groos reads the requirement of a specific indictment very narrowly, the cases he cites actually stand for the proposition that an indictment is deficient when, *as a whole*, it fails to put the defendant on notice of the claims against him. *See, e.g., U.S. v. Carll*, 105 U.S. 611, at *2 (1881) (finding an indictment defective when it "omitt[ed] the allegation . . . that the defendant knew the instrument which he uttered to be false" when this was a necessary element of the crime); *U.S. v. Yefsky*, 994 F.2d 885 (1st Cir. 1993) (finding defective an indictment for conspiracy that failed to allege an agreement where it failed to expressly incorporate the necessary factual allegations into the conspiracy count). As the Supreme Court noted in *Russell*:

> Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.

369 U.S. at 765 (citing *U.S. v. Hess*, 124 U.S. 483, 487 (1888)).

In this case, paragraphs 1 to 20 of the indictment form part of Count 1 and are expressly incorporated into Counts 2 through 4. Paragraph 11 states: "No later than on or about December 11, 2001, defendant NICHOLAS D. GROOS learned that Viking S.A. could not continue to ship products to Iran without the authorization of the U.S. government." Paragraph 13 states, in part:

4

"No later than on or about December 15, 2001, defendant NICHOLAS D. GROOS, for the purpose of evading the prohibition on exports from the United States to Iran, arranged for any further shipments . . . to be routed [via the UAE]." These factual paragraphs provide Groos with sufficient notice of the allegations against him, notwithstanding the absence of the term "knowingly" in the indictment itself.

2.    Do the Date Errors Make The Allegations Unclear?

In part, the indictment reads:

14.    On or about December 18, 2001, defendant NICHOLAS D. GROOS provided Mr. Pillai with the order previously placed . . . .
15.    On or about December 18, *2007*, Mr. Pillai provided defendant NICHOLAS D. GROOS with an order . . . .
16.    On or about December 18, *2007*, Viking S.A. issued Order Acknowledgment 100422 SD . . . .
17.    On or about December 18, 2001, Viking S.A. issued a purchase order to Viking U.S. concerning fire protection equipment . . . .

Indictment ¶¶ 14-17 (emphasis added).

Groos argues that the indictment fails to identify the precise date of the allegedly improper conduct, specifically the date an order was made or acknowledged. He argues that this information affects a material element of the charge, because the order is the only transaction at issue in the case. Groos states that the date set forth in the indictment is "obviously inaccurate" because "it is after the date of the Grand Jury's deliberations and the date the indictment was filed." Def.'s Mem. in Supp. of Mot. to Dismiss Insufficient Indictment at 5. He argues that the disparity in dates is too great to be a mere clerical or typographical error and that the Government should not be allowed to amend the indictment.[3] The Government notes that although the date

---

[3] The government has not yet moved to amend the indictment but states that it intends to do so.

"December 18, 2007" was erroneously used in two paragraphs, the paragraphs before and after contain the correct date. It also contends that the paragraphs are not material because the violations actually occurred when the equipment was sent, and the order date is incidental. In short, the government asserts that the date is irrelevant to the elements of the crime and the defendant contends that he does not have fair notice of the crime charged because of the error.

A court can make only non-material changes to an indictment, such as to correct typographical errors or errors as to nonmaterial dates. *U.S. v. Leichtnam*, 948 F.2d 370, 376 (7th Cir. 1991) (permitting amendments "to correct for a typographical or clerical error or a misnomer" such as an incorrect date "unless the particular date is an important element of the charged offense"); *U.S. v. Cina*, 699 F.2d 853, 857 (7th Cir. 1983) ("In general, either an amendment or a variance will be allowed to stand if it does not change an 'essential' or 'material' element of the charge so as to cause prejudice to the defendant."). "An 'essential' or 'material' element of a crime is one whose specification with precise accuracy is necessary to establish the very illegality of the behavior and thus the court's jurisdiction." *Cina*, 699 F.2d at 859. Nevertheless, where an indictment fails to apprise the defendant of the crime so that he can prepare his defense, as required by the Fifth Amendment, the fact that the date of an offense is not an element to a crime is irrelevant. *See U.S. v. Tsinhnahijinnie*, 112 F.3d 988, 991 (9th Cir. 1997) (finding insufficient evidence to convict of the crime charged where there was a two year variance between the date in the indictment and the government's proof).

Thus, the primary question is whether the indictment reasonably apprised Gross of the crime with which he is charged and whether he has been prejudiced at this stage in the case. The court has found no case that held that six year difference between the indictment and the

evidence was not prejudicial. *See, e.g., Tsinhnahijinnie*, 112 F.3d at 992 (finding a variance of two years between the evidence and the indictment to be in violation of the Fifth Amendment); *Cina, 699 F.2d at 859* (collecting cases where amendments for errors in dates of between several weeks and one year were permitted); *U.S. v. Rowe*, No. 02 CR 756, 2006 WL 2572099, at *2 (S.D.N.Y. Sept. 6, 2006) ("The Court cannot consider a two year variance to be immaterial."). Thus, the temporal difference between the date specified in the indictment and the actual date of the acts is troubling.

Nevertheless, the court concludes that date error did not prejudice Groos nor otherwise deprive him of his Fifth Amendment rights. First, the date of the order is not material to the crime charged. The government charged Groos with attempting to export goods to an embargoed country without a license. The dates on which the alleged shipments were made is correctly stated in the indictment. The dates of the orders for the goods that were shipped is irrelevant to whether a crime was committed. Second, the correct year (2001, not 2007) appears before and after the incorrect date in a list of sequential events in one day, indicating that the 2007 date is likely a typographical error. Third, the order at issue is identified with a reference number and customer information that provide an external means for verification of the allegations. Fourth, the 2007 date is "obviously inaccurate" given that it fell after the grand jury indictment. Fifth, Groos has been aware of the error for some time and has had adequate notice that the government wishes to amend the indictment paragraphs and change 2007 to 2001. The court concludes that an amendment would not cause prejudice to the defendant because the indictment is not insufficient to apprise Groos of the crime with which he is charged so that he can mount an adequate defense. The motion is denied.

**B. Motion to Dismiss Counts 2 and 4 for Failure to State an Offense [53]**

Groos moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3), to dismiss

Counts 2 and 4 of the indictment for failure to state an offense.[4] He argues that the EAR expired

with the EAA on August 20, 2001, and that President Bush's action to extend them pursuant to

Executive Order 13,222 was statutorily and constitutionally invalid; consequently, the EAA and

the EAR were not properly in effect at the time the alleged illegal conduct occurred. He argues

further that, even if the Executive Order properly extended the EAA and EAR, it did not satisfy

the statutory requirements for action under the IEEPA.

    1.    Statutory Background[5]

The IEEPA allows the President to exercise authority "to deal with any unusual and

extraordinary threat, which has its source in whole or substantial part outside the United States,

to the national security, foreign policy, or economy of the United States, if the President declares

a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Specifically, it

authorizes the President to "regulate, . . . prevent or prohibit . . . any . . . importation or

---

[4]Counts 2 and 4 allege violations of the IEEPA and the EAR.

[5]The Congressional Research Service has published several comprehensive reports on the EAA reauthorization process, which include information on how the EAA is related to the EAR and the IEEPA. *See, e.g.*, Ian F. Fergusson et al., Cong. Research Serv., *Export Administration Act of 1979 Reauthorization* 1-6 (2002). The 2002 report outlines "several deficiencies" that occured during a previous period when the EAA lapsed pursuant to its sunset provision and the President used his IEEPA powers to continue the EAR. *Id.* at 7-8. These "deficiencies" arose from differences between the EAR and IEEPA and included: (1) the IEEPA provides for lower criminal penalties than the EAA does, thus decreasing the deterrent effect; (2) only the EAA grants police power to enforcement agents and allows the President to deny judicial review; (3) the IEEPA does not grant explicit authority to "implement provisions to discourage compliance with foreign boycotts against friendly countries"; and (4) having the EAA lapse sends the wrong message to nations that the U.S. is encouraging to pass export control laws, namely that control of exports is not a congressional priority. *Id.*

exportation of . . . or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ." *Id.* § 1702(a)(1)(B). It further provides that "[t]he President may issue such regulations . . . as may be necessary for the exercise of the authorities granted by this chapter." *Id.* § 1704. Willful violations, or attempted violations, of "any license, order, or regulation issued under" the IEEPA lead to fines of not more than $50,000, imprisonment of not more than ten years, or both. *Id.* § 1705.

In 1969, Congress passed the EAA, the successor to the Export Control Act of 1949, to control the export of U.S. goods according to certain policy principles that balance national security and foreign policy with U.S. economic interests. *See* 50 U.S.C. app. §§ 2401-02. *See generally* Ian F. Fergusson et al., Cong. Research Serv., *Export Administration Act of 1979 Reauthorization* 1-6 (2002). The EAA has lapsed several times and the export controls have been continued using temporary statutory extensions and Executive Orders that invoke the IEEPA. The last time the EAA was reauthorized was pursuant to Public Law 106-508, which expired on August 20, 2001. The EAA remains lapsed as of this date, although a bill is pending in the 110th Congress to "amend and extend" it. *See* Export Enforcement Act of 2007, S. 2000, 110th Cong. (2007) (as referred to the Committee on Banking, Housing, and Urban Affairs on Aug. 3, 2007). The Commerce Department issued the EAR pursuant to the EAA. *See* 50 U.S.C. app. § 2414(b). The regulations establish the framework for regulating exports according to type of technology and country.

The parties agree that the EAA lapsed, subject to a sunset provision, on August 20, 2001. However, in Executive Order No. 13,222, President Bush extended export control authority and

9

the EAR by invoking the IEEPA. He declared a national emergency finding that "the unrestricted access of foreign parties to U.S. goods and technology . . . in light of the expiration of the [EAA] constitute[s] an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States . . . ." Exec. Order No. 13,222 (Aug. 17, 2001). The President therefore ordered that "the provisions of the [EAA], as amended, and the provisions for administration of the [EAA], as amended, shall be carried out under this order so as to continue in full force and effect . . . ." *Id.* § 1. The President further ordered that "[a]ll rules and regulations issued . . . under the authority of the [EAA], as amended, . . . shall . . . remain in full force and effect as if issued or taken pursuant to [Executive Order No. 13,222] . . . ." *Id.* § 2. Thus, the President, by Executive Order, continued export controls enacted under the EAA by ordering them "carried out" under the IEEPA, and explicitly extended the EAR as though issued under the IEEPA.

### 2.    The EAR And The IEEPA[6]

Groos argues that the Executive Order "bizarrely sought to keep the EAR and the EAA in effect using authority found in the wholly separate and independent IEEPA statute." Mem. in Supp. of Def.'s Mot. to Dismiss Counts 2 and 4 at 6. He argues that when the EAA expired, the EAR did not have "a legislative foundation on which to stand," and that the President's extension

---

[6]The Government argues that the court has no jurisdiction to review the validity of Executive Order No. 13,222. Although federal courts do not become embroiled in political questions and discretionary decisions of the President, they certainly may review executive actions for *ultra vires* conduct and constitutionality. *See Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 691 (1949) (specifying unconstitutional and *ultra vires* conduct by an executive officer as separate categories for judicial review); *U.S. v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080-81 (9th Cir. 1982) (refusing to review the political questions surrounding the declaration of a national emergency but stating it "was free to review whether the actions taken pursuant to a national emergency comport with the power delegated by Congress").

of the EAR was against the will of Congress. *Id.* at 7-10. He argues that this is a matter of first impression and that no court has resolved whether the President has the "constitutional and statutory authority to use IEEPA unilaterally to enact an expired statutory and regulatory regime standing independent from IEEPA." *Id.* at 12.

The court will begin with Groos's claims that President Bush's use of the IEEPA to continue regulations enacted under the lapsed EAA was an *ultra vires*, rather than an unconstitutional, act. *See Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioner's nonconstitutional claim that [the Secretary of the Army] acted in excess of powers granted to him by Congress.").

Groos argues that Congress intended for the EAA to lapse and that the President's reauthorization of the EAR via the IEEPA contravenes clear congressional intent. It is undisputed that the EAA lapsed in 2001. The enforcement of regulations in the absence of an authorizing statute is troubling. *See U.S. v. Larinoff*, 431 U.S. 864, 873 (1977) ("[R]egulations, in order to be valid[,] must be consistent with the statute under which they are promulgated."); *see also Quinn*, 401 F. Supp. 2d at 93 n.10 (noting that "the Court could not locate a pertinent case outside the realm of trade embargos" where "the statute underlying the regulations lapsed and the regulations nonetheless continued in force by virtue of executive action"). However, Congress is aware that the President invokes the IEEPA to stop-gap the EAA, yet it has never acted to change the language of the EAA or the IEEPA to bar such behavior. *See Times Publ'g Co. v. U.S. Dep't of Commerce*, 236 F.3d 1286, 1291 n.2 (11th Cir. 2001) (quoting Congressman Bingham of the 95th Congress as saying "one of the reasons why the [EAA] has been allowed to

11

expire so many times is because there was [IEEPA's predecessor statute]"). Also, it is unlikely that the President is acting in contravention of the will of Congress when he is acting under the authority of the IEEPA, which, similar to the EAA, provides for the regulation of exports, promulgation of regulations, and establishment of criminal penalties for violations.

Gross argues further that the President exceeded his authority under the IEEPA by using it to "revive and re-enact an unrelated statutory and regulatory framework." Def.'s Consolidated Reply at 2. However, the President himself has explained the relationship between the IEEPA, which deals with national security, and the EAA, which deals with export controls: without the EAA and EAR, foreign nations would have unrestricted access to U.S. goods and technology and that would pose a threat to national security. *See* Exec. Order No. 13, 222. The Government cites several cases holding that the President has authority to maintain export controls and continue the EAR, pursuant to the IEEPA, in times of lapse of the EAA. Research uncovered no case that has held that the President's extension of the EAR pursuant to the President's emergency powers under the IEEPA is an *ultra vires* act and the court concurs with the findings of previous courts that have considered the matter.

The most recent case is *Times Publishing Co.*, where the Department of Commerce had denied a plaintiff's request under the Freedom of Information Act ("FOIA"), stating that the EAA exempted the material from disclosure, even though the EAA had lapsed almost five years before. 236 F.3d at 1288. The Eleventh Circuit reviewed other cases where courts had found "that Congress has empowered the President to maintain the effectiveness of the critical EAA provisions during periods of lapse through the [IEEPA]." *Id.* at 1290 (citing *U.S. v. Mechanic*, 809 F.2d 1111, 1112 (5th Cir. 1987) and *U.S. v. Spawr Optical Research, Inc.*, 685 F.2d 1076,

1082 (9th Cir. 1982)). The court noted that the EAA had lapsed five times since its passage in 1979, that each time the President has issued an Executive Order to ensure that the EAA provisions continued, and that Congress is aware of this pattern. *Id.* at 1291 n.2. Thus, the court agreed with the Department of Commerce that an Executive Order issued by President Clinton "maintain[ed] the effectiveness of the EAA during periods of lapse." *Id.* at 1290.

Similarly, in *U.S. v. Mechanic*, the Fifth Circuit affirmed criminal convictions where the indictment alleged violations of the EAR. *See* 809 F.2d at 1112. It noted, without analysis, that the criminal acts alleged were committed during a period in which the EAA had lapsed so that "at the time the offenses were committed . . . the EAA of 1979 rested solely upon [President Reagan's] exercise of his powers under the IEEPA." *Id.* at 1113. Likewise, in *Spawr Optical Research, Inc.*, a case involving the statutory predecessors to the IEEPA and EAA, the defendants challenged the government's reliance on "allegedly defunct export regulations that they were convicted of violating." 685 F.2d at 1078. President Ford had issued Executive Order No. 11,940 declaring a national emergency and maintaining the regulations of the Export Administration Act of 1969 ("1969 EAA"), pursuant to emergency powers granted by the Trading with the Enemy Act, 50 U.S.C. app. §§ 1-44 ("TWEA"). *Id.* at 1079. The defendants shipped goods to the former Soviet Union after the 1969 EAA had lapsed "when the sole basis for the regulations was the Executive Order." *Id.* at 1080.

The defendants argued that there was no national emergency, and that the lapse of the 1969 EAA showed Congress intended to terminate the regulations. *Id.* The court found that the TWEA expressly delegated broad powers that "enabled [the President] to regulate, prevent or prohibit the exportation of any property to any foreign country." *Id.* at 1081 n.10. It reasoned

13

that the defendants' argument on Congressional intent was "rebutted by presidential and congressional actions taken concerning the [1969] EAA." *Id.* at 1081. Of note, the court observed that:

> The EAA had previously lapsed three times. In each instance, the President used an executive order virtually identical to Executive Order No. 11940 to maintain the export regulations. All three orders relied upon the same unrevoked declarations of national emergencies and on [the same section] of the TWEA. Congress not only tolerated this practice, it expressed approval of the President's reliance on the TWEA to maintain the export regulations. In passing the 1977 amendments to the [1969] EAA, Congress again conferred on the President the rule-making authority necessary to maintain the regulations.

*Id.* Because of this apparent congressional assent, the court concluded that "the President had the authority during the nine-month lapse in the EAA to maintain the export regulations." *Id.* at 1082. It is notable that the language of the TWEA that delegated power to the President is almost identical to that of the IEEPA. The reasoning of the *Times Publishing Co.* and *Spawr Optical Research* courts is persuasive and the court concludes that President Bush acted within the boundaries of broad authority granted to him pursuant to the IEEPA when he issued Executive Order 13,222.

Having found that President Bush did not act *ultra vires,* the court must now turn to the constitutionality of the President's actions. Groos argues that, by issuing Executive Order No. 13,222 and continuing regulations enacted pursuant to a lapsed act, the President enacted legislation in violation of the separation of powers and the non-delegation doctrines. The Constitution provides that legislative power is vested in Congress and the President has no general power to enact legislation. U.S. Const. art I, § 1. Thus, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."

14

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Nevertheless, where action is taken pursuant to congressional authorization, it is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily on any who might attack it." *Id.* at 637 (Jackson, J., concurring).

Gross argues that Congress could not delegate legislative authority to the President in the IEEPA that would allow him to revive or continue the lapsed EAA and EAR. However, courts rarely overturn a delegation of authority, especially in the context of foreign affairs legislation. For example, in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), the Supreme Court reviewed the constitutionality of presidential action pursuant to a joint resolution of Congress that allowed the President to issue proclamations, at his discretion, that made the sale of arms to certain countries illegal. *Id.* at 314-15. After reviewing the separation of powers doctrine, the Court detailed the special position that legislation regarding international relations occupies. *Id.* at 315-16. It stated:

> It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary, and exclusive power of the President as the sole organ of the federal government in the field of international relations – a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution.

*Id.* at 319-20. The Supreme Court cautioned that, where there is a link to international relations, a "court should not be in haste to apply a general rule which will have the effect of condemning legislation . . . as constituting an unlawful delegation of legislative power." *Id.* at 322. Because of the entanglement with issues of national security, it is in this deferential context that the President's acts pursuant to Executive Order 13,222 must be reviewed.

15

The IEEPA does not expressly grant the President the authority to continue EAA or EAR in times of emergency. It does, however, empower the President to act in furtherance of broad national security goals. In addition, it explicitly delegates authority to regulate exports, issue regulations, and impose criminal penalties, all of which are similar to provisions in the lapsed EAA. Additionally, Congress tacitly approved the presidential continuation of the EAA and EAR during times of lapse. In light of these facts, the court heeds the Supreme Court's caution in *Curtiss-Wright*: Groos has not "sustained [the] heavy burden" of showing the President's actions to be unconstitutional. *See Dames & Moore v. Regan*, 453 U.S. 654, 675 (1981) (finding constitutional President Carter's action under the IEEPA to void attachments and order the transfer of assets to Iran in response to the 1979 Iran hostage crisis). Other courts have held similarly. *See, e.g., U.S. v. Dhafir*, 461 F.3d 211, 215-17 (2d Cir. 2006) (finding congressional delegation to the executive of authority to create criminal offenses under the IEEPA constitutional because the statute concerns foreign affairs); *U.S. v. Arch Trading* Co., 987 F.2d 1087, 1093-94 (4th Cir. 1993) (finding that Congress did not violate the non-delegation doctrine when it included authority to define criminal conduct in the IEEPA); *U.S. v. Esfahani*, 05 CR 255, 2006 WL 163025, at *3 (N.D. Ill. Jan. 17, 2006) (finding defendant's argument that Congress violated the non-delegation doctrine when it passed the IEEPA "meritless" because the statute "delineates the general policy, the public agency which is to apply it, and the boundaries of the delegated authority" (citing *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989))). Consequently, the court concludes that the issuance of Executive Order 13,222 was lawfully within the discretion of the President, as was the ability to take actions to continue the EAA and EAR during a period of lapse under the IEEPA.

16

### 3.    Statutory Prerequisites Under the IEEPA

Gross points out that the President's statutory authority under the IEEPA is triggered only when four conditions are satisfied: (1) there is an "unusual and extraordinary threat"; (2) the threat has "its source in whole or substantial part outside the United States"; (3) the threat concerns "national security, foreign policy, or [the] economy"; and (4) the President declares a "national emergency." *See* 50 U.S.C. § 1701(a). He argues that the statutory prerequisites were not met for Executive Order 13,222 because there was no "unusual and extraordinary threat" where the EAA had expired many times before and because the expiration of the EAA does not have its source outside of the United States. The argument is without merit.

In Executive Order No. 13,222, the President explicitly "declare[d] a national emergency" with respect to the threat posed by "the unrestricted access of foreign parties to U.S. goods and technology . . . in light of the expiration of the [EAA, which] constitute[s] an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 13,222. The threat posed by a gap in the ability to police imports and exports from countries identified as a security risk plainly arises outside of the United States in the countries that desire to obtain U.S.-made goods. The court cannot question the President's political decision to deem this threat "unusual and extraordinary." *See, e.g., Sawr Optical Research*, 685 F.2d at 1080-81 (observing that "courts have not normally reviewed the essentially political questions surrounding the declaration . . . of a national emergency" because Congress delegates such authority to the discretion of the President). Thus, the Executive Order, on its face, shows compliance with the statutory prerequisites imposed by the IEEPA. Because the court has found the President's actions not to be *ultra vires* or unconstitutional and to have

satisfied the statutory prerequisites of the IEEPA, it denies Groos's motion to dismiss counts 2 and 4.

## C.    Motion to Strike Surplusage [57]

Groos asks the court to strike from the indictment, pursuant to Federal Rule of Criminal Procedure 7(d), paragraphs 2 through 10 which set forth the historical and legal context of the statutes and regulations that underlie the charges. He argues that the paragraphs contain conclusory statements of law and are irrelevant, prejudicial and inflammatory because certain terms, such as "national emergency" and "support for international terrorism," have nothing to do with the offenses charged.

Rule 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). Such a motion "should be granted only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." *U.S. v. Black*, 469 F. Supp. 2d 513, 518 (N.D. Ill. 2006) (internal citation and quotation marks omitted). Thus, the standard is, "rather exacting." *U.S. v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987).

The Government states that the motion is premature because the allegations may be relevant to the charge. Therefore, it urges the court to deny the motion without prejudice until the evidence closes because "[i]t is difficult at this juncture, . . . to anticipate whether any or all of the statutory citations will remain relevant." Govt.'s Consol. Resp. at 22. However, the case cited by the Government in support of its position, *United States v. McVeigh*, 940 F. Supp. 1571 (D. Colo. 1996), is inapposite. In *McVeigh*, the court declined to strike surplusage which the government might be able to introduce at trial, specifically *facts* regarding uncharged criminal

18

conduct, aliases, and the use of certain words. *See* 940 F. Supp. at 1584. A review of the paragraphs at issue here reveals no such factual material. Rather, as the government admits, the paragraphs "set forth the statutory and regulatory scheme underlying the charges in the indictment." Govt.'s Consol. Resp. at 21. The paragraphs also detail the historical and political climate in which the underlying statutes and regulations were promulgated.

Groos argues that *United States v. Spalding*, 01-152-CR, 2002 WL 818129 (S.D. Ind. Apr. 24, 2002), is analogous to the case at hand. In *Spalding*, the court granted a motion to strike part of a background section of an indictment that included statements of law. *Id.* at \*5. The court granted the motion "[b]ecause [the section] does not recite any of the essential elements of the charge and because the legal principles defined in these paragraphs may lead to confusion of issues, and in any event, will be furnished in proper form to the Jury in the final instructions." *Id.* Although the situation in *Spalding* differs from that here, in that the government in *Spalding* agreed to delete the sections, thus making the motion unopposed, the court's reasoning is applicable.

A review of the contested paragraphs shows that paragraphs 2 through 5, 7 and 8, the first sentence of paragraph 9, and paragraph 10 contain nothing more than background and contextual information. The remaining sections recite the law. The court does not see how these allegations are relevant to the Government's case and the Government has not explained it. The paragraphs at issue, for the most part, do not contain information relevant to the elements of the charges, and, as the government admits, the legal principles are more appropriately addressed at the time of the jury instruction conference. In addition, these paragraphs may be prejudicial to Groos as they describe a political climate in which economic transactions to certain nations have been

19

deemed a threat to national security. References to national security and terrorism are likely to inflame passions that could cause jurors to judge the facts more harshly than they would if presented with an indictment strictly discussing violations of a trade embargo. In light of the lack of justification for the background material and the likely prejudice to Groos, the motion to strike is granted.

**D.    Motion for Depositions of Foreign Witnesses [58]**

Groos requests authorization to depose two foreign witnesses whose testimony is allegedly critical to Gross's defense: (1) Dominique D'Antonio, a resident of Luxembourg and citizen of France and the director of operations of Viking S.A.; and (2) Mary Gennevois, a resident and citizen of France and a customer service representative of Viking S.A. Groos argues that "the testimony of these witnesses will help prove that Mr. Groos did not knowingly and willfully intend to violate [the trade embargo and export regulations] or any laws of the United States." Def.'s Mem. in Supp. of Mot. for Depositions of Foreign Witnesses at 2.

Rule 15(a) provides in relevant part:

A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice.

Fed. R. Crim. P. 15(a)(1). The Seventh Circuit has not established guidelines for when a deposition is appropriate. *See U.S. v. Sandoval*, 94 CR 714,1997 WL 458424, at *1 n.1 (N.D. Ill. Aug. 4, 1997). It has, however, stated that a criminal deposition is "unusual." *See U.S. v. Kehm*, 799 F.2d 354, 359 (7th Cir. 1986) (discussing the admissibility of deposition testimony taken at the request of the defendant in a conspiracy case and citing *U.S. v. Mann*, 590 F.2d 361 (1st Cir. 1978), which opined on whether to permit the government to take a deposition of a witness).

20

Courts have generally concluded that "only in extraordinary cases will depositions be compelled." *U.S. v. Lucas*, 516 F.3d 316, 348 (5th Cir. 2008). Exceptional circumstances exist "when the prospective witness is unavailable for trial and the absence of his or her testimony would result in injustice due to the materiality of the testimony to the case." *U.S. v. Wag-Aero, Inc.*, 888 F. Supp. 101, 102 (E.D. Wis. 1995) (citing *U.S. v. Drogoul*, 1 F.3d 1546, 1552 (11th Cir. 1993)). *Accord Sandoval*, 1997 WL 458424, at *1 (setting forth a three-part test where the court considers unavailability, materiality, and injustice).

The government argues that the motion is untimely given the close proximity of the trial, which is set for August 11, 2008. Given Groos's representation that he did not know he would need the testimony of the witnesses because the parties were discussing a plea and that the testimony is critical to his case, the court will not deny the motion as untimely. *Cf. U.S. v. Birrell*, 276 F. Supp. 798, 823 (S.D.N.Y. 1967) (denying a Rule 15 motion to depose a foreign witness where the motion to take the deposition came three weeks into trial).

Counsel for Groos stated on the record that the two witnesses are beyond the subpoena power of the court and that they are unwilling to come to the United States to testify. It is undisputed that the foreign nationals are beyond the court's subpoena power. Gross has not explained if the witnesses: (1) are unwilling to come to the United States but are willing to testify in their home countries; or (2) are unwilling to testify in either place. In his reply brief, Groos asserts in his reply that discovery would be via letters rogatory,[7] which could suggest that the

---

[7]Letters rogatory are formal requests from a U.S. court to a foreign court requesting the compulsion of testimony or other evidence. The U.S. Department of State observes that "[l]etters rogatory are a time consuming, cumbersome process and should not be utilized unless there are no other options available." *See* U.S. Dep't of State, *Preparation of Letters Rogatory*, http://www.travel.state.gov/law/info/judicial/judicial_683.html.

witnesses are unwilling to provide information even in their home countries. Groos also

hypothesizes that the witnesses have good reason not to come to the United States given that the

Government suggests in its response that they may be unindicted coconspirators. However, the

court needs to know the *actual* reasons the witnesses are unwilling to testify and cannot base its

decision on hypothetical reasons and supposition. Only by examining the specifics can it be

determined whether the witnesses are actually "unavailable" pursuant to Rule 15.[8] *See U.S. v.*

*Sandoval*, 94 CR 714, 1997 WL 566252, at \*\*1-2 (N.D. Ill. Sept. 8, 1997) (concluding that non-

hostile witnesses who had a close working relationship with the defendant were not

"unavailable" even though they were unwilling to come to the United States to testify).

Groos must provide information to the court on whether the witnesses are willing to

provide testimony in their home countries. If they are, he must also provide information on the

proposed testimony of the witnesses in order for the court to determine whether or not it is

---

[8]Some courts consider whether the deponent meets the requirements of "unavailability" under Federal Rule of Evidence 804(a), because it is on this basis that the deposition will be admissible at trial. *See* Fed. R. Crim. P. 15(f); *U.S. v. Mann*, 590 F.2d 361, 366 (1st Cir. 1978) (noting that "where the question is close" a court may "leav[e] until trial the question of whether the deposition will be admitted as evidence"). Rule 804(a) provides, in part, that a witness is unavailable where "the proponent of a statement has been unable to procure the declarant's attendance . . . by process *or other reasonable means*." Fed. R. Evid. 804(a)(5) (emphasis added). Whether or not the court conducts a Rule 804 analysis at this stage, Rule 15 "accords no presumption of admissibility simply because the deposition was taken." *Mann*, 590 F.2d at 366. Therefore, the court declines to decide whether the witnesses' testimony would be inadmissible hearsay, as the Government argues, until it knows what the testimony actually is. As Groos notes, Rule 804 provides that depositions may be used as substantive evidence where the witness is unavailable. *See* Fed. R. Evid. 804(b)(1). However, Rule 804 does not exempt hearsay within hearsay, for example deposition testimony about the content of conversations, absent another hearsay exception.

material to the defense.[9] *See, e.g., Sandoval*, 1997 WL 458424, at *2 (requiring "the witnesses to produce a detailed affidavit indicating the specific and precise nature of the witnesses' testimony so that the court can accurately evaluate the materiality"). The court requires an affidavit from each witness, not a proffer from counsel, in order to satisfy itself that the witnesses will, in fact, provide material testimony. If the witnesses are not willing to testify, Gross must provide details on why a letter rogatory will assist him in gathering information in light of the possibility that the witnesses will assert their rights against self-incrimination and refuse to testify. If the witnesses are unwilling to provide helpful testimony, then granting a Rule 15 motion, even one that compels testimony, is "an exercise in futility." *See, e.g., U.S. v. Rosen*, 240 F.R.D. 204, 208 (E.D. Va. 2007) (noting that a motion was denied because the deponents would not agree to be deposed in the United States or their home country). The court will not delay trial and impose significant expense on the Government in the absence of proof that the witnesses will testify and that the testimony is material to the defense.

The motion for depositions of foreign witnesses is denied without prejudice. If Groos submits a further motion and provides the required information to the court within fourteen days, the court will reconsider its decision. Gross has requested to submit information *in camera* and the Government has objected. The court will accept an *in camera* submission, but cautions Gross that it may order the material to be made part of the record or be provided to the

_____

[9]The Government cites *U.S. v. Rosen*, 240 F.R.D. 204 (E.D. Va. 2007) for the proposition that "[w]hen Rule 15 depositions are requested by an accused, materiality has the same meaning the Supreme Court gave the term in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, namely, that the evidence or testimony must be exculpatory, and not 'corroborative or cumulative of other evidence.'" *Id.* at 209 (citing *U.S. v. Hajbeh*, 284 F. Supp. 380, 383-85 (E.D. Va. 2003)). The court declines to decide whether this is the correct standard given that Groos alleges that the testimony is exculpatory.

Government if it feels it is appropriate.

## III. Conclusion

For the reasons stated above, the court grants the motion to strike surplusage [57], denies

the motion to dismiss insufficient indictment [55] and the motion to dismiss counts 2 and 4 [53],

and denies without prejudice the motion for depositions of foreign witnesses [58]. Defendant is

granted fourteen days to provide additional information in support of the motion for depositions

if he so wishes.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 13, 2008

24